# EXHIBIT A

Case 5:23-cv-00694-WLH-SP Document 1-1 Filed 04/19/23 Page 2 of 32 Page ID #:13

Electronically FILED by Superior Court of California, County of Riverside on 02/01/2023 02:02 PM
Case Number CVRI2300488 0000047584152 - Marita C. Ford, Interim Executive Officer/Clerk of the Court By Brian Votruba, Clerk

Taylor M. Prainito (SBN 286965)
tprainito@scllgpc.com
Michael Zelman (SBN 297682)
mzelman@scllgpc.com
**SOUTHERN CALIFORNIA LABOR LAW GROUP, PC**
1875 Century Park East, Suite 480
Los Angeles, CA 90067
Telephone: (424) 231-2366
Facsimile:  (323) 319-5148

Attorneys for Plaintiff,
JUANA BRYDON

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF RIVERSIDE**

| | |
|---|---|
| JUANA BRYDON,<br><br>vs.<br><br>LABORATORY CORPORATION OF AMERICA (a Delaware Corporation); WHITNEY HUMPHREY (an Individual); JASMINE DUFFEY (an Individual); CYNTHIA NELSON (an Individual); LINDSEY WILLIAMS (an Individual); LETTY DOE (an Individual); LANA DOE (an Individual), and DOES 1-100, inclusive,<br><br>       Defendants. | Case No. CVRI2300488<br><br>**PLAINTIFF JUANA BRYDON'S COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF FEHA;**<br><br>**(2) HARASSMENT ON THE BASIS OF RACE IN VIOLATION OF FEHA;**<br><br>**(3) DISCRIMINATION ON THE BASIS OF AGE IN VIOLATION OF FEHA;**<br><br>**(4) HARASSMENT ON THE BASIS OF AGE IN VIOLATION OF FEHA;**<br><br>**(5) DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF FEHA;**<br><br>**(6) HARASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF FEHA;**<br><br>**(7) RETALIATION FOR ENGAGING IN A PROTECTED ACTIVITY IN VIOLATION OF FEHA;**<br><br>**(8) FAILURE TO PREVENT DISCRIMINATION, HARASSMENT AND RETALIATION IN VIOLATION OF FEHA;** |

)  **(9) WRONGFUL TERMINATION OF EMPLOYMENT IN VIOLATION OF PUBLIC POLICY;**
)
)  **(10) VIOLATION OF LABOR CODE § 1102.5; and**
)
)  **(11) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**
)
)  **DEMAND FOR JURY TRIAL**

Plaintiff, JUANA BRYDON, alleges, on the basis of personal knowledge and/or information and belief:

## SUMMARY

This is an action by JUANA BRYDON, ("plaintiff" or "BRYDON"), whose employment with defendants LABORATORY CORPORATION OF AMERICA (a Delaware Corporation); WHITNEY HUMPHREY (an Individual); JASMINE DUFFEY (an Individual); CYNTHIA NELSON (an Individual); LINDSEY WILLIAMS (an Individual); LETTY DOE (an Individual); LANA DOE (an Individual) was wrongfully terminated. Plaintiff brings this action against defendants for economic, non-economic, compensatory, and punitive damages, pursuant to Civil Code section 3294, pre-judgment interest pursuant to Code of Civil Procedure section 3291, and costs and reasonable attorneys' fees pursuant to Government Code section 12965(b) and Code of Civil Procedure section 1021.5.

## PARTIES

1. *Plaintiff:* Plaintiff JUANA BRYDON is, and at all times mentioned in this Complaint was, a resident of the County of Riverside, California.

2. *Defendants:*

    a. Defendant LABORATORY CORPORATION OF AMERICA, is a Delaware Corporation, that is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in California.

    b. Defendant WHITNEY HUMPHREY, an individual, is, and at all times mentioned in this

Complaint was, a resident of Riverside County, California.

c.  Defendant JASMINE DUFFEY, an individual, is, and at all times mentioned in this Complaint was, a resident of Riverside County, California.

d.  Defendant CYNTHIA NELSON, an individual, is, and at all times mentioned in this Complaint was, a resident of Riverside County, California.

e.  Defendant LINDSEY WILLIAMS, an individual, is, and at all times mentioned in this Complaint was, a resident of Riverside County, California.

f.  Defendant LETTY DOE, an individual, is, and at all times mentioned in this Complaint was, a resident of Riverside County, California.

g.  Defendant LANA DOE, an individual, is, and at all times mentioned in this Complaint was, a resident of Riverside County, California.

h.  Defendants Does 1 through 100 are sued under fictitious names pursuant to Code of Civil Procedure section 474.  Plaintiff is informed and believes, and on that basis alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of her or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-defendants.

3.  Laboratory Corporation of America, Whitney Humphrey, Jasmine Duffey, Cynthia Nelson, Lindsey Williams, Letty Doe, Lana Doe and Doe defendants 1 to 100 may be collectively referred to as "defendants."

4.  *Relationship of defendants:*

a.  All defendants and all Doe defendants directly and/or indirectly employed plaintiff, as defined under the regulations, statutes, and interpreting case law, including California Government Code section 12926(d).

b.  All defendants and all Doe defendants compelled, coerced, aided, and/or abetted the discrimination, retaliation, and harassment alleged throughout, which is prohibited under California Government Code section 12940(i).

c.  All defendants and all Doe defendants were acting as the agents of all other defendants

PLAINTIFF'S COMPLAINT FOR DAMAGES

and employers, as defined under the regulations, statutes, and interpreting case law, including California Government Code section 12926(d).

d.    All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during employment with all defendants, on behalf of all defendants, and engaged in, authorized, ratified, and approved of the conduct of all other defendants.

e.    Plaintiff is informed and believes, and on that basis alleges, that, at all times relevant hereto, all defendants, and each of them, were the principals, agents, servants, employers, employees, partners, joint venturers, predecessors in interest, successors in interest, and/or authorized representatives of each of the other defendants, were at all times relevant herein acting within the purpose, course and scope of their agency, service, employment, partnership, joint venture, and/or representation, and were doing so with the knowledge, permission, and consent of their principals, employers, partners, joint venturers, and co-defendants, and each of them.  Plaintiff further alleges that each and every defendant was negligent, careless, and legally liable in the selection and hiring of each and every other defendant as its agent, servant, employee, consultant, assistant, representative, partner, and/or joint venturer.

f.    All defendants compelled, coerced, aided, and/or abetted the discrimination, retaliation, and harassment alleged in this Complaint, which conduct is prohibited under California Government Code section 12940(i).  All defendants were responsible for the events and damages alleged herein, including on the following bases:  (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision of, one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another.  Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist.  Adherence to the fiction of the separate existence of defendants would permit abuse of the corporate privilege and would sanction fraud and promote injustice.  All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during

employment with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all other defendants.

g. Defendants directly and indirectly employed plaintiff BRYDON, as defined in the Fair Employment and Housing Act ("FEHA") at Government Code section 12926(d).

h. In addition, defendants compelled, coerced, aided, and abetted the discrimination, which is prohibited under California Government Code section 12940(i).

5. Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

**VENUE**

6. Some of the actions at issue in this case occurred in the State of California, in the County of Riverside. Under the California Fair Employment and Housing Act, this case can alternatively, at plaintiff's choice, be filed:

> [I]n any county in the state in which the unlawful practice is alleged to have been committed, in the county in which the records relevant to the practice are maintained . . . or in the county in which the aggrieved person would have worked . . .

California Government Code § 12965(b) (emphasis added).

7. Plaintiff worked in California, and at times, conducted certain job duties in the County of Riverside.

**FACTS COMMON TO ALL CAUSES OF ACTION**

8. *Plaintiff's protected status and activity:*

a. Plaintiff is Hispanic.

b. Plaintiff is a female.

c. Plaintiff is more than 40 years old.

d. Plaintiff suffered from a disability and/or medical condition. Specifically Plaintiff experienced and was diagnosed with severe stress, panic attacks, anxiety, high blood pressure, insomnia, and depression.

e.    Plaintiff made good faith complaints about the discrimination and harassment she experienced and violations of law and policy while employed by defendants to defendants' human resources department and to her supervisors and/or managers.

8.    Juana Brydon ("Brydon") is a Hispanic female and is currently 58 years old. She was hired at LabCorp's San Bernardino location at 339 E Highland Ave Suite 510, San Bernardino, CA 92404 as a Phlebotomist/Patient Service Technician on or around October 15, 2007. Brydon was responsible for performing blood draws, collecting and preparing specimens for testing and analysis, maintaining patient information and billing records, and worked in various capacities during her employment. Brydon was a professional, ethical, and dedicated employee who was competent and qualified for the position and completed all of her tasks and assignments efficiently, with or without a reasonable accommodation. Brydon loved serving the predominantly Hispanic population of patients she worked with and strove for excellence despite LabCorp's toxic work environment and revolving door of supervisors.

9.    Within the first few years of working at LabCorp, Brydon quickly gained a reputation at LabCorp for tirelessly advocating for a safer work environment and closely following LabCorp's policies and procedures. Brydon highly valued patient safety and reported any and all safety concerns, policy violations, and unsafe working conditions to her supervisors and human resources.

10.    In or around July 2010, one of Brydon's managers, Cynthia Nelson ("Nelson") asked Brydon to transfer to LabCorp's Perris location because there was a shortage of qualified and competent employees. Brydon agreed to help out and transferred shortly after Nelson's request.

11.    Within her first few weeks working at LabCorp's Perris location, Brydon began noticing that the office was rife with safety violations and staffed with inexperienced and incompetent phlebotomists. The office was filled with exposed electrical outlets, including in patient rooms, which posed a safety hazard. In addition, the other two phlebotomists working at the location were barely able to perform basic venipunctures, i.e. intravenous blood draws, and did not know how to do finger stick blood draws using lancets as an alternative. Brydon witnessed multiple incidents where the two phlebotomists were unable to perform venipunctures in pediatric patients and continued attempting to enter the patients' veins to the point of causing bruising and pain. Because the two phlebotomists had no training on how to properly perform finger sticks, they would roughly and incorrectly puncture pediatric patients' fingers, regularly

-6-

causing excessive bleeding and patient distress.

12.    Not long after witnessing LabCorp's unsafe working conditions and policy and procedural violations, Brydon reported them to Nelson. Nelson refused to investigate Brydon's complaint and took no further action to remedy the situation except to transfer the two phlebotomists to a different LabCorp location. Nelson retaliated against Brydon for her patient and workplace safety complaints by not hiring any full-time replacement phlebotomists for almost an entire year. During that time, Brydon ran herself into the ground working as the only full-time phlebotomist at LabCorp's Perris location. Brydon persevered and single handedly helped keep the office afloat, but did so at the cost of missing her meal and rest breaks because of the extreme pressure her supervisors exerted to get tasks done no matter what. Brydon continued experiencing meal and rest break violations throughout the rest of her time at LabCorp and was rarely able to take any rest breaks at all due to management pressure.

13.    On November 18, 2010, Brydon's supervisor Chris Flores ("Flores") issued her a write-up for "excessive absenteeism." Most of the dates that Brydon was written up for were for bereavement leave after Brydon's nephew was murdered. In response, Brydon sent Human Resources ("HR") Consultant Heather Nagy ("Nagy") a written statement explaining her circumstances and need for bereavement leave. Nagy did nothing to address Brydon's concerns so Brydon signed the write-up, feeling helpless and powerless.

14.    As time went on, a clear pattern of retaliation emerged. When Brydon reported violations of LabCorp's policies and procedures, harassment, and/or safety concerns to her supervisors, she was often met with managerial inaction coupled with write-ups in retaliation for having spoken out in the first place.

15.    On a later occasion, taking place on or around July 12, 2013, Brydon contacted her supervisor Erika Franco ("Franco") to lodge a verbal complaint against her coworker and fellow phlebotomist "Connie" for speaking to her in a threatening manner, refusing to perform her job duties, which included assisting with blood draws and doing data entry, and mostly refusing to communicate with Brydon. Franco arrived to take Brydon's statement that day, but dismissed all of her concerns. Instead, Franco told Brydon that her only priority should be servicing LabCorp's patients in a timely manner.

16.    On or around July 31, 2013, Franco and one of Brydon's other supervisors Claire Acevedo ("Acevedo") held a roundtable meeting where both Brydon and "Connie" could share their side of the

story. Brydon reiterated her complaint about Connie's refusal to communicate with Brydon and perform her job duties, which included assisting Brydon with blood draws and doing data entry. Instead of addressing or investigating Brydon's complaint any further, Franco and Acevedo issued Brydon a written warning that wrongly blamed Brydon for her supposed "unwillingness to work with certain employees due to lack of communication." In fact, Brydon was the one suffering from her coworkers' lack of communication and was being retaliated against once more for complaining to her supervisors. Brydon was miserable and struggling in LabCorp's hostile work environment, but continued working because she could not afford to lose her livelihood and wanted to continue serving the patients she worked with.

17.    Some of Brydon's supervisors, including Franco, exhibited such hostility towards employees that LabCorp sent them to a "bootcamp" to learn how to tone down their abusive workplace behavior.

18.    Throughout 2013 and 2014, Brydon's complaints continued to fall on deaf ears. In June 2014, Christi Flanary ("Flanary") became Brydon's supervisor and Brydon continued to make complaints about policy violations, harassment, and/or safety concerns to Flanary.

19.    In or around 2014, LabCorp began only accepting cash payments for certain procedures. Whenever Brydon drove to make deposits, she was never reimbursed for gas or mileage. Brydon complained to Flanary about this, but Flanary did nothing to address Brydon's complaint. Flanary also occasionally demanded that Brydon deposit the cash payments outside of work hours which Brydon would not be paid for.

20.    In or around January 2015, Phlebotomist "Olga" transferred to the Perris location and told Brydon that supervisors and employees at other nearby LabCorp facilities were "poisoning the well" against Brydon by spreading negative rumors about her because of her reputation for closely adhering to policies, procedures, and safety protocols, and willingness to complain about said issues to her supervisors. Brydon was dismayed after learning that she was being targeted and vilified just for doing her job and protecting patient safety. Brydon's stress levels skyrocketed and her mental health plummeted.

21.    By July 2015, Brydon was experiencing serious stress, panic attacks, anxiety, high blood pressure, insomnia, and depression. Brydon's physician Dr. George Villanueva ("Dr. Villanueva") recommended that Brydon go out on a stress leave due to her rapidly worsening physical and mental

health and prescribed her four medications to address her condition. Brydon provided HR and her supervisors, including Flanary, with a doctor's note and took a medical leave from around July to mid-October 2015.

22.    While Brydon was out on her medical leave, one of LabCorp's phlebotomy interns let her know that Flanary held a meeting with everyone in the office and directed employees to closely follow Brydon, document everything she did, and immediately report to her if Brydon made even the slightest mistake. Brydon was fearful of losing her job and felt as if she was being retaliated against for going out on a medical leave and making complaints about policy violations, harassment, and/or safety concerns to Flanary.

23.    In 2016, Flanary left LabCorp and Amber Hubert ("Hubert") took over as Brydon's supervisor, along with Le'Nesha Glenn ("Glenn"). A few weeks into her time at LabCorp, Hubert warned Brydon that she needed to be careful because her reputation for advocating for workplace safety and complaints about policy violations and safety concerns had put a considerable target on her back.

24.    Beginning in 2016, Brydon's coworkers, phlebotomists Whitney Humphrey ("Humphrey"), Jasmine Duffey ("Duffey"), "Lana", "Letty", and supervisor Lindsey Williams ("Williams") began harassing Brydon on the basis of her medical condition/disability. After Brydon disclosed her medical condition/disability to her supervisors, coworkers, and HR, she was increasingly targeted and harassed. Brydon suffered from panic attacks, severe anxiety, nausea, and diarrhea and vomiting related to her anxiety at work. Brydon regularly had to enter the poorly insulated bathroom to sob and vomit, where all of her coworkers could hear her. Whenever Brydon made complaints to either Hubert, Glenn, or Williams, she would burst out into tears due to her anxiety and stress. While making a complaint and disclosing her struggles with anxiety to Williams on one occasion in or around late 2016, Williams mockingly told Brydon that she was the problem because she was "taking things [too] personally."

25.    On another occasion in mid-2017, Brydon left patient documents on a desk while she went to perform a blood draw in a different room. Upon her return, Brydon's documents were nowhere to be found. Brydon frantically searched the premises for the documents and could not locate them anywhere. Brydon's anxiety escalated to the point of bringing her to the brink of a panic attack. Brydon eventually discovered the documents deliberately shoved under a shelf in the supply room. The only other LabCorp

employee working at that time was "Lana."

26. Continuing into 2017 and onwards, Brydon's coworkers, Duffey and "Letty" made fun of Brydon's medical condition/disability, would call her "paranoid," and laughed at Brydon's anxiety symptoms and panic attacks. At the same time Duffey and "Letty" harassed Brydon and accused her of being "paranoid", they also conspired with Humphrey and "Lana" to tamper with Brydon's specimens, rip patient labels off her specimen tubes when she was not watching, and steal her specimens. Brydon noticed that there were plenty of times when she would leave a specimen for processing in the centrifuge for a few minutes, and when she would return, the patient label was ripped off or the specimen itself was nowhere to be found. Each time Humphrey, Duffey, "Lana", or "Letty" tampered with her patient specimens, Brydon's anxiety ratcheted up, at times reaching the point of an uncontrollable panic attack. Brydon was then forced to unnecessarily redo blood draws on her patients and obtain new urine or stool samples.

27. Brydon complained verbally about Humphrey, Duffey, "Lana", and "Letty's" conduct to any of her supervisors who were willing to listen, including Glenn and Williams, but nothing came of her complaints and no action was taken to address the harassment she was being subjected to. Brydon's experience with Humphrey, Duffey, "Lana", and "Letty's" harassment and discriminatory treatment is characteristic of the hostile work environment that Defendants created after Brydon began experiencing her medical condition/disability. Defendants failed to provide reasonable accommodations to Brydon in the form of addressing and quashing the harassment and goading she was experiencing at the hands of Humphrey, Duffey, "Lana", and "Letty."

28. In or around the beginning of 2018, Nelson and other LabCorp supervisors came up with the idea of putting up a cork board in the patient waiting area and publicly posting the compliment cards employees received from patients to boost morale. Within a few weeks of putting up the cork board, Brydon's compliment cards took up nearly half of the board's surface. Brydon received glowing praise from the patients she served and Brydon appreciated the visual representation of her hard work and patients' appreciation. Not long after Brydon's compliment cards were covering the morale-boosting cork board, Brydon came into work one day to find all of her compliment cards torn off the board, ripped apart, and thrown into the trash. That same day, Brydon found out from her coworkers that "Letty" and

-10-

"Lana" were the ones who tore off her compliment cards because they could not stand that much board space being devoted to her positive accomplishments. Brydon was extremely hurt and upset. Brydon complained to Nelson about her compliment cards being ripped off and destroyed, but nothing ever came of her complaint. Nelson promised Brydon that she would "look into it" and proceeded to do absolutely nothing.

29.    In or around February or March 2018, employees from LabCorp's San Bernardino location where Brydon had previously worked, contacted the Perris LabCorp employees, informing them that they were in the process of unionizing and asked them to attend an informational meeting with a union representative. The meeting took place sometime shortly after in around February or March 2018, and many of LabCorp's Perris employees, including Brydon attended.  Right after attending the meeting where LabCorp's Perris employees were airing their grievances, Brydon found out from her coworkers that Nelson had commandeered some of the Perris employees to infiltrate the meeting and report back with a list of everyone in attendance.

30.    On March 6, 2018, Glenn sent out an email saying that LabCorp would be holding its own Town Hall meeting. Brydon and other LabCorp employees knew that these Town Hall meetings were essentially mandatory and that employees faced the threat of being reprimanded if they did not attend. Brydon attended the scheduled Town Hall meeting at which LabCorp employees were discouraged from joining a union or forming a union while being plied with food.

31.    On April 13, 2018, Brydon was issued a write-up for a few unscheduled absences. Brydon felt pressured into signing the write-up but immediately protested the write-up's contents. Shortly before she was issued the write-up, Brydon had received a phone call from her daughter's school while working letting her know that her daughter was feeling very sick and was throwing up. Brydon contacted her supervisor to let them know about the situation and that she needed to go pick up her sick daughter. Brydon was told that she could not leave because she had no time off, but still decided to leave early to deal with her daughter's health emergency. Brydon felt pressured into signing the write-up, but immediately protested the write-up's contents and wrote a note explaining that she left to take care of her sick daughter.

32.    Sometime in May and June 2018, Brydon walked into the breakroom and saw Glenn sitting at

-11-

the table with a stack of papers. Glenn got up and left the breakroom without taking the papers so Brydon looked at them. Brydon was shocked to see a list numbered 1-26 mentioning her. Number 4 read "written statements about union busting on May 1st" and Number 5 read the same except "...on June 15." The rest of the items on the list consisted of other written or verbal warnings Brydon had received at LabCorp and her responses, going as far back as Brydon's November 2010 written statement to Nagy contesting her write-up and explaining her circumstances and need for bereavement leave after her nephew's murder. Brydon was taken aback and terrified after seeing Glenn's list. Brydon feared that she was being targeted for her complaints and was at risk of losing the job that she depended on to provide for her family.

33.    On top of being targeted for participating in an information union meeting, Brydon continued to have an increasingly difficult time dealing with the ongoing racial and age harassment she was suffering at the hands of Humphrey, Duffey, "Lana", "Letty", Williams, and "Laura."

34.    Throughout 2018 and 2019, Humphrey, a Caucasian woman, made it a point of saying "this is America, we speak English" on multiple occasions, directed both to Brydon, a bilingual Hispanic woman, and to the majority Hispanic and Spanish-speaking patient population that frequented LabCorp's Perris facility. Humphrey was especially rude to non-English speaking Hispanic patients. She would frequently make remarks like "I hate these people"; "why do patients keep asking me for help on the tablet…it's not my fault they speak no English"  and; "that patient got mad at me for skipping one of her kids paperwork…it's not my fault these people walk in with a bunch of kids."  Brydon found each of these comments to be offensive, harassing and racist.

35.    When a patient would ask Humphrey or "Lana", also a Caucasian woman, a question in Spanish, or even broken English, both women would show absolutely no interest in trying to assist them, instead would routinely act bothered and pawn the patients off on Brydon and say "here, she can help you."  "Lana" would oftentimes witness Humphrey's offensive behaviors and would step in to support her. "Lana" openly made fun of Hispanic patients who communicated in broken English. Humphrey's and "Lana's" behavior and remarks left Brydon not only feeling upset about the patients' mistreatment, but also feeling personally discriminated against.

36.    In or around June 2018, there was an incident with a Spanish-speaking Hispanic woman who was waiting in line when "Lana" and Humphrey asked her to step aside and wait for Brydon to help her,

sending the woman to the back of the line. "Lana" and Humphrey made the patient wait for over two hours to receive care because they refused to do anything to assist her.

37.    On or around August 14, 2018, there was another racially discriminatory incident where the daughter of a Spanish-speaking cancer patient asked one of Brydon's coworkers, phlebotomist and bilingual, Spanish-speaking Hispanic woman Gabriela Valdiviezo ("Valdiviezo"), if her father could be brought in ahead of other patients because his body was blistered and he was unable to remain seated for long periods of time due to pain.  She even said she would ask the other patients waiting in the lobby for their permission to have her dad's blood drawn ahead of them due to his precarious health condition. Before Valdiviezo could respond, Humphrey stepped in and rudely said "No!  We can't do that!  If I bring your patient in then other patients will want to ask the same thing!"  When Valdiviezo asked the lady to give her a few moments to call her supervisor for approval, Humphrey again interrupted saying "no!  we can't do that!" and then "Lana" jumped in saying "no, we can't do that because if we accommodate your dad today you are going to ask for the same every time you come in."  The daughter, who spoke English, left the window for a few minutes, but returned again to beg for accommodations for her father telling them he was in a lot of pain and if that was their dad how would they feel with Humphrey again saying "no," that she was sorry about her dad's condition, but she could not help her.

38.    The very next day, on or around August 15, 2018, a Caucasian patient was transported to the PSC on a gurney accompanied by her daughter who requested to speak to "Lana," and in front of other patients, she asked "Lana" if her mother could be drawn ahead of the other patients waiting.  "Lana" approved her request while Humphrey was standing there. Brydon witnessed "Lana" instructing Valdiviezo to draw this patient and making a comment that if the patient's daughter from the day before had not made such a big deal, she would have done the same for her dad.  Brydon heard Valdiviezo reply, saying it was not about the daughter being rude or not, and she was not rude, but it was about equally accommodating patients with the greatest need. Brydon confided to Valdiviezo that she felt discriminated against by Humphrey and "Lana." Even after Valdiviezo complained to Glenn about Humphrey and "Lana's" behavior toward them and the Spanish-speaking patients, no corrective action was taken. Brydon and Valdiviezo were discouraged and disappointed following Valdiviezo's complaints because Glenn took no corrective action and did nothing to address or investigate Humphrey and "Lana's" racially

harassing and discriminatory behavior.

39.    At the same time Brydon was dealing with Humphrey and "Lana's" racial harassment, she was also faced with "Lana", "Letty", and Humphrey's harassing comments about her age. Humphrey asked Brydon how old she was and after getting a response, derisively said "you're that old." After Humphrey told "Lana" and "Letty" Brydon's age, all three women ganged up on Brydon and began telling her "you work so slow" and questioning "why [she was] so slow?". The three women made those same comments out in the open waiting area where all patients could hear. Brydon felt harassed and humiliated at being ridiculed out in the open for her age.

40.    "Lana" and another phlebotomist "Laura" would also make jokes that Brydon smelled "inappropriate like [she doesn't] shower" after complaining about a musty "old people" smell emanating from older and elderly patients in the waiting area. "Lana" and "Laura" were known for loudly making fun of older and elderly patients in the waiting area and often refused to perform their blood draws, forcing Brydon to perform their blood draws and specimen collection instead. "Lana" and "Laura" picked and chose which patients they wanted to help and regularly left older and elderly patients in the waiting area in Brydon's care. Sometime in or around mid-2018, there was an instance where "Lana" and "Laura" deliberately skipped an elderly female patient and left Brydon to perform the patient's blood draw by leaving to go to the bathroom together at the exact same time the moment Brydon walked back into the waiting area. Brydon's stress levels and anxiety symptoms continued to worsen as a result of the harassment she was experiencing on a frequent basis and Brydon grew increasingly fearful that she would experience a nervous breakdown.

41.    By the end of 2019, Brydon's work environment had only continued to deteriorate. Brydon kept receiving baseless write-ups that left her feeling like she would never escape retaliation and stop being targeted for all of her complaints about policy violations, safety concerns, and harassment on the basis of her medical condition/disability, race, and age, and it was only a matter of time before there was a proverbial straw that broke the camel's back.

42.    One example of these baseless write-ups came on or around October 28, 2019, when Glenn wrote Brydon up for "interacting with patients in a rude and discourteous manner…on 9/12/2019 and 9/30/2019." Brydon refused to sign the write-up because she knew that she always treated patients with

courtesy and respect. To her dismay, after she refused to sign the October 28, 2019 write-up, Brydon was issued a subsequent retaliatory write-up on or around November 1, 2019 for the same false allegations and was pressured into signing.

43.   Another example came in or around December 2019 when Glenn wrote Brydon up for "falsifying" documents after Brydon wrote her initials on a sticky note and attached them to the temperature log instead of writing directly on the log itself. Brydon protested the write-up because she knew that it was a regular practice at LabCorp to add changes with a signed stick note, but there was little she could do. Brydon felt incredibly hopeless and demoralized, coming even closer to a nervous breakdown.

44.   In or around December 2019, "Lana" and "Letty"  also continued targeting Brydon in another incident where they hid her bag of thirty or so blood samples under the shelf after Brydon had gotten the samples ready for courier pickup. When blood samples were tampered with, they had to be discarded and new blood samples had to be drawn. Brydon complained to Glenn, but "Lana" and "Letty" faced no repercussions.

45.   Brydon felt a small modicum of relief after Letty transferred out of the Perris location in or around February 2020, but that relief did not last long. On February 5, 2020, right after Letty was transferred out of the Perris location, Brydon received a text message from an unknown number saying "I am sure you are doing better to me now that the problem has been sent to my location." Brydon understood that to mean that "the problem" the anonymous texter was referring to was "Letty" and felt scared because she had no clue who the vaguely threatening message was coming from. "Letty" returned to LabCorp's Perris location only a few months later.

46.   Upon her return, "Letty" would regularly come in an hour before her scheduled shift just to scrutinize Brydon while she worked. When Brydon asked "Letty" why she was coming in an hour before her scheduled shift, "Letty" always had an excuse, but when Brydon began performing her job duties, Brydon would notice "Letty" watching her every move. Brydon's anxiety symptoms and stress level were once again reaching a boiling point.

47.   Despite her rapidly declining mental and physical state, from around May through July 2020, Brydon continued complaining about the safety and policy violations she witnessed to her supervisors,

PLAINTIFF'S COMPLAINT FOR DAMAGES

Williams, Jessica Chennault ("Chennault") and Viviana Orozco ("Orozco"), but once again, no action was taken to address her complaints. Brydon complained about "Letty" and Duffey's practice of cutting off the tips of their gloves to make it easier for them to find patients' veins. Brydon knew that this practice was highly unsanitary, potentially dangerous, and put employees and patients at risk of contracting viruses like HIV and Hepatitis B and C. Brydon also complained to Williams and Nelson about "Letty's" lack of personal protective equipment when working with patients. Brydon witnessed "Letty" drawing blood and processing specimens without a plastic shield or jacket on multiple occasions.

48.    On or around July 12, 2020, Brydon was drawing blood and speaking to a Spanish-speaking Hispanic patient. Unbeknownst to her, "Letty" was sitting right next to the thin divider shared between the breakroom and draw room Brydon was in, and was on a call with Williams on speakerphone listening in on Brydon's conversation containing protected health information. After Brydon finished drawing blood from her patient, Williams called Brydon and warned her that she "should be careful" and that she was checking to make sure Brydon was not having an inappropriate conversation with a patient. Letty and Williams did not understand or speak any Spanish. Brydon was aghast at Letty and Williams's racially harassing conduct, extremely distressed and on the verge of having a panic attack.

49.    The next day, on or around July 13, 2020, Brydon broke down and told Dr. Villanueva everything that she had been feeling and experiencing. Due to Brydon's precarious physical and mental state, Dr. Villanueva immediately wrote Brydon a doctor's note placing her on a stress leave/medical leave of absence. Brydon promptly provided her doctor's note to HR employee Alicia Gutierrez ("Gutierrez") and began her leave.

50.    Williams and Chennault contacted Brydon repeatedly throughout her leave about work-related issues when they were not supposed to do so and Brydon was already providing Gutierrez with her updated doctors' notes as she received them. During her leave, Brydon reached a point where she knew she could not return to LabCorp's hostile work environment because she was likely to commit suicide if she endured any more harassment, discrimination, and retaliation. The hostile work environment and harassment and discrimination Brydon was subjected to on the basis of her medical condition/disability, race, age, and complaints about what she reasonably believed to be violations of law and policy, had become intolerable to the point where no reasonable person could endure them. Accordingly, Brydon

was left with no other choice other than to quit and resigned on February 1, 2021. Brydon remains a shell of her former self and has yet to recover from the intolerable working conditions she endured at LabCorp.

51.    *Economic damages:*  As a consequence of defendants' conduct, plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, stock options, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

52.    *Non-economic damages:*  As a consequence of defendants' conduct, plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

53.    *Punitive damages:*  Defendants' conduct constitutes oppression, fraud, and/or malice under California Civil Code section 3294 and, thus, entitles plaintiff to an award of exemplary and/or punitive damages.

a.    *Malice:*    Defendants' conduct was committed with malice within the meaning of California Civil Code section 3294, including that (a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, including by terminating plaintiff's employment and/or taking other adverse job actions against plaintiff because of her race, age, disability, and/or good faith complaints, and/or (b) defendants' conduct was despicable and committed in willful and conscious disregard of plaintiff's rights, health, and safety, including plaintiff's right to be free of discrimination, harassment, retaliation, and wrongful employment termination.

b.    *Oppression:*  In addition, and/or alternatively, defendants' conduct was committed with oppression within the meaning of California Civil Code section 3294, including that defendants' actions against plaintiff because of her race, age, disability, and/or good faith complaints were "despicable" and subjected plaintiff to cruel and unjust hardship, in knowing disregard of plaintiff's rights to a work place free of discrimination, harassment, retaliation, and wrongful employment termination.

c.    *Fraud:*  In addition, and/or alternatively, defendants' conduct, as alleged, was fraudulent within the meaning of California Civil Code section 3294, including that defendants asserted false (pretextual) grounds for terminating plaintiff's employment and/or other adverse job actions, thereby to

cause plaintiff hardship and deprive her of legal rights.

61.    *Attorneys' fees:*  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

62.    *Exhaustion of administrative remedies:*  Prior to filing this action, plaintiff exhausted her administrative remedies by filing a timely administrative complaint with the Department of Fair Employment and Housing ("DFEH") and receiving a DFEH right-to-sue letter.

## FIRST CAUSE OF ACTION

### (Violation of FEHA (Government Code § 12900, *et seq.*)

### (Discrimination on the Basis of Race)—Against Defendants

### Laboratory Corporation of America, and Does 1 to 100,

### Inclusive)

63.    The allegations set forth in paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

64. Plaintiff's race (Hispanic) was a substantial motivating factor in defendants' decision to terminate plaintiff's employment, not to retain, hire, promote, or otherwise employ plaintiff in any position, and/or to take other adverse job actions against plaintiff.

65. Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, *et seq.,* and defendants committed unlawful employment practices, including by the following, separate bases for liability:  terminating, discharging, barring, promote, hire, select, and/or employ, and/or otherwise discriminating against plaintiff, in whole or in part on the basis of plaintiff's race in violation of Government Code section 12940(a).

66. As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

67. As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

68.   Defendants' misconduct was committed intentionally, in a malicious, despicable, oppressive manner, and fraudulent manner, entitling plaintiff to punitive damages against defendants.

69.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Plaintiff is at present unaware of the precise amounts of these expenses and fees and will seek leave of court to amend this Complaint when the amounts are fully known.

## SECOND CAUSE OF ACTION

**(Harassment on the Basis of Race) (Government Code § 12940(a), (i), (m), (n))—Against All Defendants and Does 1 to 100, Inclusive)**

70.   The allegations set forth in paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.   At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants.  This statute requires defendants to refrain from harassing any employee because of his or her race or national origin.  Within the time provided by law, plaintiff filed a complaint with the DFEH, in full compliance with administrative requirements, and received a right-to-sue letter.

72.   Defendants engaged in actions to harass plaintiff because of her race.  Defendants directed comments to plaintiff, as was stated above, shunned her in daily activities, refused to involve her in various projects including but not limited to tradeshows, and made other offensive, harassing remarks about plaintiff's race.  These actions gave plaintiff the message that her race was unwelcome in the work place.

73.   As a proximate result of defendants' willful, knowing, and intentional harassment, plaintiff has sustained damages in a sum according to proof.

74.   As a proximate result of defendants' willful, knowing, and intentional harassment, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

75.   Defendants' misconduct was committed intentionally, in a malicious, despicable, oppressive manner, and fraudulent manner, entitling plaintiff to punitive damages against defendants.

76.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is at present unaware of the precise amounts of these expenses and fees and will seek leave of court to amend this Complaint when the amounts are fully known.

### THIRD CAUSE OF ACTION

### (Violation of FEHA (Government Code § 12900, *et seq.*) (Age Discrimination)—Against Defendants Laboratory Corporation of America and Does 1 to 100, Inclusive)

77.   The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

78.   At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants. This statute requires defendant to refrain from discriminating against any employee because she or she is more than 40 years old. Within the time provided by law, plaintiff filed a complaint with the DFEH, in full compliance with administrative requirements, and received a right-to-sue letter.

79.   During plaintiff's employment with defendants, defendants, through their supervisors, engaged in actions that had a negative impact on the treatment of employees who were more than 40 years old. Specifically, defendants discharged older employees with greater frequency than younger employees, hired fewer employees who were older than 40, and gave better jobs and benefits to younger employees.

80.   During plaintiff's employment with defendants, defendants intentionally engaged in age discrimination by discharging employees over the age of 40 with greater frequency than other employees. During plaintiff's employment with defendants, defendants had a pattern and practice of discriminating against employees who were more than 40 years old.

81.   Plaintiff was a qualified employee at the time of the termination of her employment and was more than 40 years old. Defendants continued to hire younger employees to replace the older employees whom they were discharging or otherwise forcing out of the company. Defendants replaced Plaintiff with a younger employee, under 40 years old, after terminating Plaintiff. All of defendants' conduct raises an inference of discrimination.

82.    Defendants, through their managers and supervisors, made a number of comments to and about plaintiff and made staffing decisions and/or transfers that exhibited ageist motivations, intentions, and consciousness.  Plaintiff believes and, on that basis, alleges that defendants' real motivation was to discharge her because of her age.

83.    Defendants' conduct, as alleged, violated FEHA, and defendants committed unlawful employment practices, including by the following, separate bases for liability:

a.    Discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against plaintiff, in whole or in part on the basis of plaintiff's age and/or other protected characteristics, in violation of Government Code section 12940(a);

b.    Harassing plaintiff and/or creating a hostile work environment, in whole or in part on the basis of plaintiff's age and/or other protected characteristics, in violation of Government Code section 12940(j);

c.    Failing to take all reasonable steps to prevent discrimination and harassment based on age and/or other protected characteristics, in violation of Government Code section 12940(k);

d.    Retaliating against plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing defendants' failure to provide such rights, in violation of Government Code section 12940(h).

84.    On the basis of the above, plaintiff believes and alleges that her age was a substantial motivating factor in defendants' termination of her employment.

85.    As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

86.    As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

87.    Defendants' discrimination was done intentionally, in a malicious, fraudulent, oppressive manner, entitling plaintiff to punitive damages.

88.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs

(including expert costs) in an amount according to proof.

**FOURTH CAUSE OF ACTION**

**(Violation of FEHA (Government Code § 12900, *et seq.*) (Age Harassment)—Against Defendants   Laboratory Corporation of America, Lana Doe, Letty Doe and Does 1 to 100, Inclusive)**

89.   The allegations set forth in paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90.   Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, *et seq.,* and defendants committed unlawful employment practices, including by the following, separate bases for liability:

      a.   Harassing plaintiff and/or creating a hostile work environment, in whole or in part on the basis of plaintiff age and/or other protected characteristics, in violation of Government Code section 12940(j);

      b.   Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on age, in violation of Government Code section 12940(k).

91.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

92.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

93.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

94.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, oppressive manner, entitling plaintiff to punitive damages against defendants.

## FIFTH CAUSE OF ACTION

### (Violation of FEHA (Government Code § 12900, *et seq.*) (Disability Discrimination)—Against Defendant Laboratory Corporation of America and Does 1 to 100, Inclusive)

95.    The allegations set forth in paragraphs 1 through 94 are re-alleged and incorporated herein by reference.

96.    Plaintiff's actual, perceived, and/or history of disability and/or other characteristics protected by FEHA, Government Code section 12900, *et seq.,* were motivating factors in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, to refuse to accommodate plaintiff, to refuse to engage in the interactive process, and/or to take other adverse job actions against plaintiff.

97.    Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, *et seq.,* and defendants committed unlawful employment practices, including by the following, separate bases for liability:

a.    Discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against plaintiff, in whole or in part on the basis of plaintiff's actual, perceived, and/or history of disability and/or other protected characteristics, in violation of Government Code section 12940(a);

b.    Failing to accommodate plaintiff's actual, perceived, and/or history of disability, in violation of Government Code section 12940(m);

c.    Failing to engage in a timely, good faith interactive process to determine reasonable accommodation, in violation of Government Code section 12940(n);

d.    Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on actual, perceived, and/or history of disability, in violation of Government Code section 12940(k);

e.    Retaliating against plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing defendants' failure to provide such rights, including rights of reasonable accommodation, rights of interactive process, leave rights, and/or the right to be free of discrimination, in violation of

Government Code section 12940(h);

f.    Failing to provide plaintiff with requisite statutory leave, violating notice and/or other procedural requisites of leave, and/or retaliating against plaintiff for taking leave, in violation of Government Code section 12945.2.

98.    As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

99.    As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

100.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

101.    Defendants' misconduct was committed intentionally, in a malicious, despicable, oppressive manner, and fraudulent manner, entitling plaintiff to punitive damages against defendants.

## SIXTH CAUSE OF ACTION

**(Violation of FEHA (Government Code § 12900, *et seq.*) (Medical**

**Condition and/or Disability Harassment—Against All Defendants and**

**Does 1 to 100, Inclusive)**

102.    The allegations set forth in paragraphs 1 through 101 are re-alleged and incorporated herein by reference.

103.    Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, *et seq.,* and defendants committed unlawful employment practices, including by the following, separate bases for liability:

h.    Harassing plaintiff and/or creating a hostile work environment, in whole or in part on the basis of plaintiff's actual, perceived, and/or history of disability and/or other protected characteristics, in violation of Government Code section 12940(j);

i.   Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on actual, perceived, and/or history of medical condition and/or physical disability, in violation of Government Code section 12940(k).

104.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

105.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

106.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

107.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, oppressive manner, entitling plaintiff to punitive damages against defendants.

## SEVENTH CAUSE OF ACTION

### (Violation of FEHA (Government Code § 12900, *et seq.*) (Retaliation
### for Engaging in a Protected Activity)—Against Defendants
### Laboratory Corporation of America, and Does 1 to 100, Inclusive)

108.   The allegations set forth in paragraphs 1 through 107 are re-alleged and incorporated herein by reference.

109.   Plaintiff's engagement in protected activity, including good faith complaints and/or opposition to discrimination and harassment based on race, age, disability, and/or good faith complaints protected by FEHA, Government Code section 12900, *et seq.,* were motivating factors in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse job actions against plaintiff including baseless write-ups and reprimands.

110.   Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, *et seq.,* and defendants committed unlawful employment practices, including by the following, separate bases for

liability:

   a.   Demoting, discharging, barring, refusing to retain, refusing to transfer, hire, select, and/or employ, and/or otherwise discriminating against plaintiff, in whole or in part on the basis of plaintiff's race, age, disability, good faith complaints and/or other protected characteristics by FEHA, Government Code section 12900, *et seq.,* in violation of Government Code section 12940(a);

   b.   Harassing plaintiff and/or creating a hostile work environment, in whole or in part on the basis of plaintiff's race, age, disability, good faith complaints and/or other protected characteristics, in violation of Government Code section 12940(j);

   c.   Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on race, age, disability, and/or good faith complaints in violation of Government Code section 12940(k);

   d.   Retaliating against plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing defendants' failure to provide such rights, including rights of reasonable accommodation, rights of interactive process, leave rights, and/or the right to be free of discrimination, in violation of Government Code section 12940(h);

   e.   Failing to accommodate plaintiff's actual, perceived, and/or history of disability, in violation of Government Code section 12940(m);

   f.   Failing to engage in a timely, good faith interactive process to determine reasonable accommodation, in violation of Government Code section 12940(n);

   g.   Creating a hostile work environment, in whole or in part on the basis of plaintiff's actual, perceived, and/or history of disability and/or other protected characteristics, in violation of Government Code section 12940(j);

   h.   Retaliating against plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing defendants' failure to provide such rights, including rights of reasonable accommodation, rights of interactive process, leave rights, and/or the right to be free of discrimination, in violation of Government Code section 12940(h);

   i.   Failing to provide plaintiff with requisite statutory leave, violating notice and/or other procedural requisites of leave, and/or retaliating against plaintiff for taking leave, in violation of

-26-

Government Code section 12945.2.

111.   As a proximate result of defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

112.   As a proximate result of defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

113.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

114.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, oppressive manner, entitling plaintiff to punitive damages against defendants.

### EIGHTH CAUSE OF ACTION

**(Failure to Prevent Discrimination, Harassment, and**

**Retaliation in Violation of FEHA (Government Code**

**§ 12940(k))—Against Defendants Laboratory Corporation**

**of America, and Does 1 to 100, Inclusive)**

115.   The allegations set forth in paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

116.   At all times herein mentioned, FEHA, Government Code section 12940(k), was in full force and effect and was binding on defendants.  This statute states that it is an unlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Prior to filing the instant Complaint, plaintiff filed a timely administrative charge with the DFEH and received a right-to-sue notice.

117.   During the course of plaintiff's employment, defendants failed to prevent their employees from engaging in intentional actions that resulted in plaintiff's being treated less favorably because of plaintiff's protected status (*i.e.,* her race, age, disability, and/or participation in protected activities and/or

her good faith complaints and opposition).  During the course of plaintiff's employment, defendants failed to prevent their employees from engaging in unjustified employment practices against employees on the basis of such protected classes.  During the course of plaintiff's employment, defendants failed to prevent a pattern and practice by their employees of intentional discrimination on the basis of engagement in protected activity and protected status.

118.  Plaintiff believes and on that basis alleges that her protected status and/or engagement in a protected activity was a substantial motivating factor in defendants' employees' discrimination and retaliation against her.

119.  As a proximate result of defendants' willful, knowing, and intentional misconduct, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

120.  As a proximate result of defendants' willful, knowing, and intentional misconduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

121.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Plaintiff is at present unaware of the precise amounts of these expenses and fees and will seek leave of court to amend this Complaint when the amounts are fully known.

122.  Defendants' misconduct was committed intentionally, in a malicious, fraudulent, oppressive manner, entitling plaintiff to punitive damages against defendants.

**NINTH CAUSE OF ACTION**

**(Wrongful Constructive Termination of Employment in Violation of Public Policy (Labor Code § 1102.5; FEHA, Government Code § 12900, *et seq.*)—Against Defendants Laboratory Corporation of America, and Does 1 to 100, Inclusive)**

123.  The allegations set forth in paragraphs 1 through 122 are re-alleged and incorporated herein by reference.

124.  Defendants terminated plaintiff's employment in violation of various fundamental public policies underlying both state and federal laws.  Specifically, plaintiff's employment was terminated in

part because of her protected status (*i.e.,* her age, disability, race, and/or good faith complaints). These actions were in violation of FEHA, the California Constitution, and California Labor Code section 1102.5.

125.    As a proximate result of defendants' wrongful termination of plaintiff's employment in violation of fundamental public policies, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

126.    As a result of defendants' wrongful termination of her employment, plaintiff has suffered general and special damages in sums according to proof.

127.    Defendants' wrongful termination of plaintiff's employment was done intentionally, in a malicious, fraudulent, oppressive manner, entitling plaintiff to punitive damages.

128.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Code of Civil Procedure sections 1021.5 and 1032, *et seq., plain*tiff is entitled to recover reasonable attorneys' fees and costs in an amount according to proof.

### TENTH CAUSE OF ACTION

### (Violations of Labor Code § 1102.5, *et seq.*—

### Against Defendants Laboratory Corporation of America, Lindsey

### Williams, and Does 1 to 100, Inclusive)

129.    The allegations set forth in paragraphs 1 through 128 are re-alleged and incorporated herein by reference.

130.    At all relevant times, Labor Code section 1102.5 was in effect and was binding on defendants. This statute prohibits defendants from retaliating against any employee, including plaintiff, for raising complaints of illegality.

131.    Plaintiff raised complaints of illegality while she worked for defendants, and defendants retaliated against her by terminating her employment.

a.    Specifically, plaintiff reported the unlawful discrimination and retaliation she was experiencing from defendants on the basis of her race, age, disability and/or good faith complaints.

b.    Plaintiff also reported what she reasonably believed to be violations of law relating to health and public safety.

132.    As a proximate result of defendants' willful, knowing, and intentional violations of Labor Code section 1102.5, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

133.    As a result of defendants' adverse employment actions against plaintiff, plaintiff has suffered general and special damages in sums according to proof.

134.    Defendants' misconduct was committed intentionally, in a malicious, fraudulent, oppressive manner, entitling plaintiff to punitive damages against defendants.

## ELEVENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress—Against All

### Defendants and Does 1 to 100, Inclusive)

135.    The allegations set forth in paragraphs 1 through 134 are re-alleged and incorporated herein by reference.

136.    Defendants' discriminatory, harassing, and retaliatory actions against plaintiff constituted severe and outrageous misconduct and caused plaintiff extreme emotional distress.

137.    Defendants were aware that treating plaintiff in the manner alleged above, including depriving her of her livelihood, would devastate plaintiff and cause her extreme hardship.

138.    As a proximate result of defendants' extreme and outrageous conduct, plaintiff has suffered and continues to suffer severe emotional distress.  Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits as a result of being emotionally distressed.

139.    As a proximate result of defendants' extreme and outrageous conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

140.    Defendants' misconduct was committed intentionally, in a malicious, fraudulent, oppressive manner, entitling plaintiff to punitive damages.

//

**PRAYER**

WHEREFORE, plaintiff, JUANA BRYDON, prays for judgment against defendants as follows:

1.   For general and special damages according to proof;

2.   For exemplary damages, according to proof;

3.   For pre-judgment and post-judgment interest on all damages awarded;

4.   For reasonable attorneys' fees;

5.   For costs of suit incurred;

6.   For injunctive relief;

7.   For such other and further relief as the Court may deem just and proper.


ADDITIONALLY, plaintiff, JUANA BRYDON, demands trial of this matter by jury.  The amount demanded exceeds $25,000.00 (Government Code § 72055).


Dated:  February 1, 2023

**SOUTHERN CALIFORNIA**
**LABOR LAW GROUP, P.C.**

By:  _____
Taylor M. Prainito, Esq.
Michael Zelman, Esq.

Attorneys for Plaintiff,
JUANA BRYDON

-31-
PLAINTIFF'S COMPLAINT FOR DAMAGES